[No. 15933-7-III.   Division Three.   April 29, 1997.]

THE STATE OF WASHINGTON, *Respondent,* v. JOHN W. MEDLOCK, *Appellant.*

*John R. Muenster* and *Muenster and Koenig*, for appellant.

*James R. Sweetser, Prosecuting Attorney,* and *Kevin M. Korsmo, Deputy,* for respondent.

THOMPSON, J. — John Medlock appeals his conviction of first degree felony murder. He contends the court erred in denying his motion to suppress his statements to Canadian and Washington police officers because he was not properly advised of his rights. He also claims his statements that he took money from the victim should have been suppressed. He finally contends his motion to dismiss the information should have been granted. We affirm.

On October 18, 1993, Rebecca Hedman's body was found on the bank of the Spokane River. An autopsy revealed that the cause of death was a blunt impact injury to the head and/or strangulation.

On December 28, the Port Moody British Columbia Police Department received a call from Beverly Medlock that her son, John, was suicidal. Constable Jack Sarna with the Port Moody Police Department stopped Mr. Medlock around 9:30 P.M. He informed Mr. Medlock why he was stopped and asked him if he really wanted to kill himself. Mr. Medlock said he did. Constable Sarna asked Mr. Medlock why he wanted to kill himself, and Mr. Medlock stated because he had killed someone in Spokane.

Corporal Allan Dunn, Constable Michael Rae, and Constable Pamela Gagnier arrived at the scene and heard a comment about a murder. Constable Sarna started to ask another question, but Constable Rae interrupted and advised that Mr. Medlock be read his "Charter Rights."[1] Mr. Medlock understood his rights but did not want a lawyer. Constable Sarna then informed Mr. Medlock he was not required to say anything, and anything he did say would be used as evidence. Again Mr. Medlock stated he understood. Mr. Medlock was also given the opportunity to contact an American lawyer. Mr. Medlock understood but did not wish to contact a lawyer.

Mr. Medlock was detained under the Mental Health Act of British Columbia. He was also told he was being detained for a homicide investigation. Corporal Dunn asked Mr. Medlock if he would go to the police station for an interview before they took him to the hospital and he agreed. At the police station Corporal Dunn again asked Mr. Medlock if he understood his rights. He said he did. Mr. Medlock did not wish to contact a lawyer or anyone else. Mr. Medlock then confessed to killing Rebecca Hedman on October 17, by hitting her on the back of the head with a baseball bat. He said the murder occurred at the Ranch Motel, cabin number nine, in Spokane. He dumped

---

[1]Charter Rights are rights provided under Canada's Constitution, which state: "It is my duty to inform you that you have the right to retain and instruct counsel without delay. You may call any lawyer you want. A Legal Aid duty lawyer is available to provide legal advice to you without charge and can explain the Legal Aid plan to you. If you wish to contact a Legal Aid duty lawyer, I can provide you with a telephone number. Do you understand that?"

the body by the Spokane River. He put the baseball bat in a storage locker.

Mr. Medlock was taken to a local hospital for evaluation. A doctor found him to be depressed and suicidal and detained him under the Mental Health Act.

Corporal Dunn then contacted the Spokane Police Department to inquire about whether there had been a murder. Detective Donald Giese of the Spokane Police Department confirmed that the murder had actually occurred. Detective Giese obtained a search warrant for the motel and the storage locker. He seized a baseball bat from the locker and a piece of blood-stained carpet from the room.

On December 29, Detective Giese and Detective James Peterson went to Canada to interview Mr. Medlock. On December 30, the State charged Mr. Medlock with first degree murder. After Canada issued an extradition warrant, Detective Giese, Detective Peterson, and Corporal Kenneth Lylack of the Port Moody Police Department went to interview Mr. Medlock. Corporal Lylack introduced the Spokane detectives to Mr. Medlock and told him they were there to talk to him about the homicide. Mr. Medlock was read both his Charter Rights and *Miranda* [*v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 A.L.R.3d 974 (1966)] warnings. No one told Mr. Medlock he had been charged with murder or that an extradition warrant had been issued. Mr. Medlock indicated he understood his rights, did not want a lawyer and agreed to speak with the officers. He then confessed to the murder. He also told the officers he paid the deceased $50 for oral and vaginal sex, but that he was not satisfied and wanted the money back. After he hit the decedent on the head, he removed the money from her sock.

The Canadian courts held a four-day hearing on Washington's request for extradition. Mr. Medlock was represented by Canadian counsel. He argued that the Port Moody officers had no reason to detain him under the Mental Health Act; thus, his confessions were invalid and he could not be extradited. He also argued his confession

was not valid due to his emotional state and because he did not know that charges had been filed. The court found the detention was lawful and granted the request for extradition.

The State filed an amended information charging Mr. Medlock with first degree felony murder, with robbery as the felony, or in the alternative second degree felony murder, with assault as the felony. Mr. Medlock moved to suppress his confessions to both Canadian and American authorities. He also moved to dismiss the first degree felony murder charge on corpus delicti grounds. He finally moved to dismiss the information claiming it was inadequate. The court denied all his motions. Mr. Medlock went to trial and was convicted of first degree felony murder. He now appeals.

██ Mr. Medlock contends the court erred by denying his motion to suppress the statements he made to the Canadian law enforcement officers. Foreign police officers are not required to comply with the laws of the United States unless they are acting as agents of United States law enforcement officers, or at least "acting with the cooperation and assistance of state officers." *State v. Johnson*, 75 Wn. App. 692, 700, 879 P.2d 984 (1994), *review denied*, 126 Wn.2d 1004 (1995). When Constable Sarna stopped Mr. Medlock he was investigating a report of a suicidal male. He had no knowledge of the Hedman murder in Spokane. Further, when Corporal Dunn questioned Mr. Medlock at the police station, he was doing so to assess Mr. Medlock's mental state. He, too, knew nothing about the Hedman murder. Although Corporal Dunn admitted his intent was to help the Spokane authorities if a murder had occurred, at the time the statements were made, there was no knowledge, cooperation, or assistance between the two agencies. Thus, the Canadian authorities were not required to comply with Washington law. Evidence legally seized by one law enforcement agency can be used by another. *In re Personal Restraint of Teddington*, 116 Wn.2d 761, 774-75, 808 P.2d 156 (1991). So long as

the Port Moody officers complied with Canadian law, there is no reason to suppress Mr. Medlock's statements.

██ Mr. Medlock also argues that the Port Moody officers failed to comply with Canadian laws. He contends his arrest under the Mental Health Act of British Columbia was unlawful. However, the Canadian judicial officer presiding at the extradition hearing determined that the arrest was lawful. The doctrine of comity allows a court in one jurisdiction to recognize the law in another jurisdiction. *Haberman v. Washington Pub. Power Supply Sys.*, 109 Wn.2d 107, 160-61, 744 P.2d 1032, 750 P.2d 254 (1987). The decision to invoke comity is discretionary. *Id.* at 161. In ruling on the motion to suppress, the trial court deferred to the Canadian ruling. It was well within the court's discretion to recognize that ruling. Mr. Medlock also contends the Canadian court did not consider all of his argument regarding the illegality of the arrest. A reading of the record indicates the court heard the argument and simply failed to rule in his favor. This court concludes the Port Moody officers did not violate the Mental Health Act.

██ If for no other reason, the detention was lawful under the Mental Health Act. The Mental Health Act allows an officer to take an individual into custody and immediately to a hospital if he believes an individual acted in a manner likely to endanger himself and suffers from a mental disorder. It is clear the Canadian officers felt Mr. Medlock was a danger to himself and suffered from a mental disorder. The real issue is whether detaining Mr. Medlock at the station was a violation of the Mental Health Act. While neither party cites any Canadian law interpreting the statute, Washington has a similar statute and we can use our case law as a guide. RCW 71.05.150(4)(b) allows an officer to take an individual into custody who is a threat to himself or others and take him to a treatment facility. Holding a civil detainee for a short time in a segregated, nonjail-type room pending a mental health evaluation is not a violation of RCW 71.05.150(4)(b).

*State v. Mason*, 56 Wn. App. 93, 98, 782 P.2d 572 (1989), *review denied*, 114 Wn.2d 1010 (1990). Only two and a half hours elapsed from Mr. Medlock's original detention and his arrival at the treatment facility. Under the circumstances, this is a short period of time within the *Mason* interpretation. Further, Mr. Medlock agreed to accompany the officers to the police station. There is no basis to find that the Canadian Mental Health Act was violated. The court did not err in denying Mr. Medlock's motion to suppress his statements to the Canadian officers.

■ Mr. Medlock also assigns error to the court's finding that he declined legal counsel after he was arrested on the extradition warrant. A trial court's findings of fact will not be disturbed on appeal if they are supported by substantial evidence. *Bering v. Share*, 106 Wn.2d 212, 220, 721 P.2d 918 (1986). The court's finding that Mr. Medlock refused counsel was supported by substantial evidence. Mr. Medlock was told to seriously consider obtaining counsel. He was shown the telephone booth and given the telephone number to contact an attorney. He went in the telephone booth and stated he called his mother and gave her the telephone number. He further stated he did not want an attorney. The court did not err in entering a finding that Mr. Medlock declined the assistance of counsel.

■ Mr. Medlock next contends the court erred by denying his motion to suppress his statements to the Spokane officers. Mr. Medlock asserts that his right to counsel under CONST. art. I, § 22 (amend. 10) and U.S. CONST. amend. VI has been violated. When a defendant alleges violation of state and federal constitutional provisions, the state claim is analyzed first. *State v. Young*, 123 Wn.2d 173, 178, 867 P.2d 593 (1994). Determining whether the Washington constitution provides greater protection than the United States Constitution requires an analysis under *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808, 76 A.L.R.4th 517 (1986). *Young*, 123 Wn.2d at 179. Although the State contends that the two constitutional provisions have been determined to be identical, both sides have

briefed the requisite factors which enable us to conduct an independent constitutional analysis of this case. *See State v. Wethered*, 110 Wn.2d 466, 472-73, 755 P.2d 797 (1988).

The Washington State Constitution provides in pertinent part, "In criminal prosecutions the accused shall have the right to appear and defend in person, or by counsel." Const. art. I, § 22 (amend. 10). It is this right to counsel that is at issue.

Next, we compare the text of the Washington constitution to its federal counterpart. *Gunwall*, 106 Wn.2d at 65. The United States Constitution provides in pertinent part: "In all criminal prosecutions, the accused shall . . . have the assistance of counsel for his defense." U.S. Const. amend. VI. There does not appear to be a substantial difference between the two clauses.

The third consideration is the state constitution and common law history. *Gunwall*, 106 Wn.2d at 65-66. Washington based its constitutional rights on the constitutions of states already in existence rather than the federal constitution. Justice Robert J. Utter, *Freedom and Diversity in the Federal System: Perspectives on State Constitutions and the Washington Declaration of Rights*, 7 U. Puget Sound L. Rev. 491, 496-97 (1984). Mr. Medlock argues that because the Washington constitution was framed from other states' constitutions rather than the federal constitution, independent analysis of Const. art. I, § 22 (amend. 10) is warranted. But Mr. Medlock's assertion does nothing to persuade or explain that the framers intended to reach a different result than reached under the federal constitution. *See State v. Russell*, 125 Wn.2d 24, 59-60, 882 P.2d 747 (1994) (holding Washington's exclusionary rule is not broader than the federal exclusionary rule), *cert. denied*, 115 S. Ct. 2004 (1995).

The fourth factor requires us to look at preexisting state law. *Gunwall*, 106 Wn.2d at 66. Case law in Washington indicates that Const. art. I, § 22 (amend. 10) and the Sixth Amendment have been interpreted as carrying the same protections. *See State v. Earls*, 116 Wn.2d 364, 373, 805

P.2d 211 (1991); *City of Tacoma v. Heater*, 67 Wn.2d 733, 736, 409 P.2d 867 (1966); *State v. Holley*, 75 Wn. App. 191, 197 n.2, 876 P.2d 973 (1994). Further, prior to *Miranda*, Washington did not require an individual be informed of the right to counsel before an interrogation. *See State v. Craig*, 67 Wn.2d 77, 82, 406 P.2d 599 (1965); *State v. Brownlow*, 89 Wash. 582, 154 P. 1099 (1916); *State v. Washing*, 36 Wash. 485, 78 P. 1019 (1904). Prior state law does not indicate that Washington's right to counsel was more protective than its federal counterpart.

■ The fifth factor requires a consideration of the different structures of the federal and state constitutions. *Gunwall*, 106 Wn.2d at 66. The federal constitution grants power to the federal government, while the state constitution limits the power of the government. *Russell*, 125 Wn.2d at 61. This factor will always favor independent analysis. *Id.*

■ The sixth and final factor requires a consideration of whether the issue is a matter of particular state interest. *Gunwall*, 106 Wn.2d at 67. State law enforcement issues are a matter of local interest. *Young*, 123 Wn.2d at 180. Thus, this factor also may weigh in favor of independent interpretation.

■ When looking at all six factors, only the last two seem to warrant an independent state interpretation. Evaluating all six factors, there is no basis to conclude CONST. art. I, § 22 (amend. 10) should be interpreted so as to provide more protection than the Sixth Amendment.

Mr. Medlock's Sixth Amendment right to counsel had attached at the time of his interrogation by the Spokane police because he had been formally charged at that time. *See Brewer v. Williams*, 430 U.S. 387, 398, 97 S. Ct. 1232, 51 L. Ed. 2d 424 (1977). He argues that his waiver of this right was not valid because he was not aware that charges had been filed. In *Patterson v. Illinois*, 487 U.S. 285, 108 S. Ct. 2389, 101 L. Ed. 2d 261 (1988), the defendant argued that although he had been given *Miranda* warnings, he

did not validly waive his right to counsel under the Sixth Amendment. The Supreme Court rejected his argument finding that *Miranda* sufficiently informed the defendant of his right to counsel during questioning and the consequences of waiving that right. *Id.* at 293.

The key inquiry in determining whether a waiver is valid is whether the defendant knew of his rights during questioning and the consequences of waiving those rights. *Id.* Mr. Medlock affirmatively indicated throughout his custody in Canada that he was aware of his rights and was waiving them. Having told Canadian officers that he was distraught because he had killed someone certainly indicates he knew of the seriousness of the matter and potential consequences. Informing him of the actual charge would not have heightened his awareness of the seriousness of his situation. The court did not err in denying Mr. Medlock's motion to suppress his statements to the Spokane officers.

Mr. Medlock contends the court erred by denying his motion to suppress on corpus delicti grounds. A confession alone will not sustain a conviction unless it is corroborated by independent proof sufficient to establish the crime's corpus delicti. *State v. Riley*, 121 Wn.2d 22, 32, 846 P.2d 1365 (1993). Evidence need only support a logical and reasonable deduction that a crime occurred. *Id.* The elements of corpus delicti in a homicide case are (1) a death, and (2) a causal connection between the death and a criminal act. *State v. Lung*, 70 Wn.2d 365, 371, 423 P.2d 72 (1967). Mr. Medlock argues that the corpus delicti rule should require independent proof of the predicate felony. In support of this argument, he cites to other jurisdictions which have required independent proof of the predicate felony. But in Washington, the corpus delicti rule does not require that the underlying felony be established independent of a confession. *State v. Burnette*, 78 Wn. App. 952, 957, 904 P.2d 776 (1995), *review denied*, 128 Wn.2d 1010 (1996). In *State v. Quillin*, 49 Wn. App. 155, 162, 741 P.2d 589 (1987), *review denied*, 109 Wn.2d 1027 (1988), the court

did not alter the corpus delicti elements even though the charge was felony murder. Thus, the court did not err in denying the motion to suppress on corpus delicti grounds.

■ Mr. Medlock also contends the court erred when it ruled orally that independent evidence existed which established the victim was a prostitute. The judge's oral ruling on this issue did not become part of the findings of fact. In any event, no evidence other than Mr. Medlock's statement established prostitution. Thus, the part of the oral ruling which indicated independent evidence existed establishing prostitution was not supported by substantial evidence and was in error. *Bering v. Share*, 106 Wn.2d 212, 220, 721 P.2d 918 (1986). However, the error was harmless. Statements involving prostitution and robbery pertained to the predicate felony and were not relevant to establish the corpus delicti. It was not necessary to establish these facts by independent evidence.

■ Finally, Mr. Medlock contends the information was defective because it did not list the elements of the predicate felonies. All necessary elements of the charged offense must be set forth in the information so that the defendant understands the charges against him and can adequately prepare a defense. *State v. Bacani*, 79 Wn. App. 701, 703, 902 P.2d 184 (1995), *review denied*, 129 Wn.2d 1001 (1996). When an information is challenged pretrial, it is strictly construed. *State v. Johnson*, 119 Wn.2d 143, 150, 829 P.2d 1078 (1992). An information is insufficient when it does not set forth all the necessary elements of a charge. *Id.* In Washington, the elements of the underlying felony are not elements of the crime of felony murder. *State v. Bryant*, 65 Wn. App. 428, 438, 828 P.2d 1121, *review denied*, 119 Wn.2d 1015 (1992); *State v. Hartz*, 65 Wn. App. 351, 354, 828 P.2d 618 (1992). Although the underlying crime itself is an element in felony murder, the defendant is not actually charged with that crime. *Id.* The predicate felony is a substitute for the mental state which the prosecution would otherwise be obligated to establish. *Id.* The information did not have to set forth

the elements of either of the predicate felonies to be sufficient. Thus, the court did not err in denying the motion to dismiss.

We affirm.

SCHULTHEIS, A.C.J., and KURTZ, J., concur.

Review denied at 133 Wn.2d 1012 (1997).